### Jeff Taylor v. The State.

, No. 1991.  Decided February 28, 1900.

**1.  Former Jeopardy—Submitting Plea to Jury—Practice.**

On a trial for the murder of one J., committed in the perpetration of a train robbery, defendant filed a plea of former jeopardy and conviction for an assault with intent to rob one W., the express messenger, in the same transaction, which said plea the court struck out and refused to submit it to the jury.  Held, upon the facts in evidence, that while the offenses were committed in the same transaction, they were so distinct in point of time and action as to constitute distinct offenses, and the court did not err in striking out said plea and in refusing to submit it to the jury.

**2.  Same—Distinct Offenses in One Transaction.**

A party may be convicted and punished for distinct offenses of assault or homicide upon different persons committed in one transaction and be separately punished for each.

**3.  Murder—Compelling Deceased to Go to the Place of Danger—Charge.**

On a trial for murder in the perpetration of a train robbery, where it appeared that deceased, who was a fireman on the train, was taken by one of the robbers from his place on the train to the express car, the point of danger, and while there, in a shooting which took place between a passenger on the train and the robbers, the fireman was shot and killed, but whether by a robber or the passenger, was not shown;  Held, the court did not err in instructing the jury in the charge, in effect, that if defendant and those with him in attempting to perpetrate the robbery of the train used deceased for their purpose and compelled him to occupy a dangerous place in order to consummate their design, then defendant would be responsible for his death, whether he was killed by any one of the robbers or by a passenger upon the train who was resisting the robbers.

**4.  Same—Reproducing Testimony of a Conspirator.**

On a trial for murder in the perpetration of train-robbery, it was error to permit the testimony of a coconspirator, given upon another trial where defendant was not present, to be reproduced against defendant.

Appeal from the District Court of Coleman.  Tried below before Hon. J. O. Woodward.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The indictment charged appellant with the murder of Lee Johnson, on the 9th of June, 1898, by shooting him with a gun and pistol.

The following statement is taken from the brief of counsel for appellant, to wit:

On June 9, 1898, appellant, Jeff Taylor, Bud Newman, Bill Taylor, and Pearce Keaton attempted to rob the messenger of the Wells Fargo Express on the west-bound passenger train near Coleman, Coleman County, Texas, when the train stopped to go on the "Y" leading west.  They shot a fusilade of shots in the air.  One of them took Lee Johnson, the fireman, to the express car door, to have L. L. White, the messenger, open up.  They returned to the engine to cut off the injector, then went back to the express car door, and Johnson said, "Mr. White, this is me, the fireman.  They want you to open up."  At this time R. E. Buchanan, a passenger on the smoking car, began to shoot at the robbers from the rear of the car.  They shot at

him. Buchanan shot six times. The robbers shot several times. Johnson, who was between the shooters, was killed. The train was headed southeast. The parties shooting were on the east side. Johnson, when shot, was facing the train. All except Bill Taylor (who escaped) were arrested in Sutton County and brought here, where they were indicted at the September, 1898, term of court for murder and attempt to rob,—appellant in cause No. 1406 for murder and in cause No. 1412 for attempt to rob. September 16, 1898, appellant plead guilty of said attempt to rob in cause No. 1412; had a jury, who heard the evidence and charge of the court. They found him guilty on his plea and the evidence and gave him eight years in the penitentiary, and judgment was entered thereon. He was sentenced and went to the penitentiary. He was brought back for trial on the murder indictment in cause No. 1406 for February term, 1899, of court. When this cause was called for trial the prosecution and defense, by attorneys, agreed to continue it. The court refused to let the agreement stand. Then appellant by his attorney filed plea to the jurisdiction of the court, plea of former conviction, and plea of not guilty. The court overruled appellant's plea of former conviction as a matter of law, and refused to submit it to the jury as a question of fact.

The other material facts in the case are shown in the opinions below.

*T. R. Austin* and *Jenkins & McCartney*, for appellant.—The court erred in not sustaining defendant's plea of former conviction. Herera v. State, 35 Texas Crim. Rep., 607; Moore v. State, 33 Texas Crim. Rep., 166; Wright v. State, 17 Texas Crim. App., 159; Grisham v. State, 19 Texas Crim. App., 513; Bish. New Crim. Law, secs. 1057, 1058, 1064.

The court erred in not submitting defendant's plea of former conviction to the jury as an issue to be found by them. Code Crim. Proc., arts. 561-563; Wills. Code Crim. Proc., art. 716, notes 2, 5.

The court erred in permitting Mr. Crossin, the district attorney, to reproduce the testimony of Pearce Keaton, given on his (Keaton's) trial in another case when defendant was not present but in jail. Const., art. 1, sec. 10; Rule 35, Sayles' New Civ. Stats., art. 2299; Wills. C. C., p. 292, note 11; Whart. Crim. Law (ed. 1868), sec. 662.

The court erred in his general charge to the jury in the following particulars, which defendant excepted to at the time: (1) In defining robbery. (2) In not defining assault with intent to rob. (3) In defining principals in such a manner, and putting no limitation upon it, that it was calculated to mislead and confuse the jury and make them convict even if they believed that Buchanan killed Lee Johnson. (4) In defining "conspiracy" without limiting it to rob,—there being no evidence that defendant or those acting with him conspired to murder. (5) In telling the jury to convict even if they believed Buchanan killed Johnson under the facts of this case, and the circumstances set

forth in the charge, for the following reasons, to wit: (a) Because the evidence shows that defendant and those acting with him did not place Johnson in front of the express car to get him shot, but to prevent a shooting, which it did, from the only place they feared the trouble—the express car; (b) because in front of the express car was no more dangerous than at any other place along the line; (c) because said charge forces the jury to convict even if they believed Buchanan killed Johnson, and does not allow them to pass on that question; (d) it destroys defendant's presumption of innocence, and forces a conviction even if Johnson came to his death by any outside, independent, and unexpected force by a mere passenger,—one who was under no obligation to shoot; (e) it does not give the defendant the benefit of a reasonable doubt as to existence of facts that would not render him guilty if Buchanan killed Johnson; (f) it does not submit the law of murder in the second degree.

Court must charge law of the case: Wills. Code Crim. Proc., arts. 715, 716, and notes 2, 4, 5. On acting together: Wills. Penal Code, p. 43, note 3, and authorities. On construction: Wills. Penal Code, arts. 3, 9, and note 8 under art. 9. On the charge assuming danger under the express car: Wills. Code Crim. Proc., p. 233, note 6. On charges destroying presumption of innocence: Wills. Code Crim. Proc., art. 765, note 3, and authorities; 2 Bish. New Crim. Law, secs. 637, 641, 868.

The court erred in telling the jury in effect, in his general charge, that Buchanan innocently shot, as the evidence was that when Buchanan shot, Lee Johnson was so near to the robbers as to make Buchanan guilty at least of negligent homicide if he killed Johnson, thus invading the province of the jury without allowing them to pass on the question whether or not he was innocently shot.

Buchanan shot six times up the train from the corner of the smoker towards the engine. Johnson was between Buchanan and the robbers. He was facing the train. He was near the express car door. No robbers were in the rear of the train from Johnson. No one shooting there but Buchanan. If the ball entered his right side, Buchanan shot him. Drs. Pope, Hayes, and Long said it entered from the right. Charge on the weight of evidence: Wills. Code Crim. Proc., p. 233, note 6.

*Sims & Snodgrass* and *Rob't A. John*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life, and he prosecutes this appeal.

The homicide occurred on June 9, 1898, in an attempt by appellant and three others to rob a train on the Gulf, Colorado & Santa Fe Railway. During the attempt to rob said train one of the parties engaged

in it, to wit, Newman, took deceased, Johnson, who was a fireman on the train, from the engine to the front of the express car; the others of the party remaining near the engine. While Newman and deceased, Johnson, were parleying at the express car, one Buchanan, a passenger on the train, came out on the rear of the passenger coach and began firing. Appellant and those with him returned the fire, and in the progress thereof Johnson, the fireman, was shot and killed. Appellant and those with him immediately fled, and were captured about three days thereafter in Sutton County, at the ranch of Bill Taylor, one of the alleged train robbers. A number of questions are raised in the record, but we will only discuss such as we deem important, and are likely to occur again.

Appellant filed a plea in bar of the State's action, setting up that he had once been in jeopardy; alleging, in proper form, that he had been convicted of an assault with intent to rob one White, the express messenger, and that said assault was one and the same transaction in which the alleged murder occurred. Proof was admitted on this plea, but the court, in his charge, refused to submit the plea to the jury; thus, in effect, striking out said plea, and holding that the same did not constitute a former jeopardy. In order to present this question, we will state substantially the case as made on behalf of appellant: The State proved a conspiracy on the part of appellant, his brother Bill Taylor, one Keaton, and Newman, to rob the express on the Santa Fe Railway train in Coleman County, at a certain point, known as "Coleman Junction." They came together from Sutton County to the place, armed and prepared to execute the purpose of their conspiracy. They met the train, which was a passenger train as well as an express train, at the point agreed upon, in the nighttime, on the 9th of June, 1898. When they stopped the train they fired off their pistols, and immediately boarded the engine, which had run out on the switch, preparatory to changing its course, and took in custody Lee Johnson, fireman, and James Stanton, the engineer. They took them out of the cab onto the ground. Two of the conspirators held the engineer in charge near the engine; and one of them, to wit, Newman, took Lee Johnson in charge, and carried him in front of the express car, and at once undertook to have the express messenger, White, open the express car. They used both threats and persuasion to procure the messenger to open the door. Some suggestion being made that the injector of the engine required attention, Newman conveyed Johnson back to the engine. He there rearranged the injector, and Newman and Johnson then went back to the express car. About this time one Buchanan, who was a passenger, and also appears to have been in the employ of the railroad company as claim agent, came out on the rear platform of the passenger coach, and down on the steps, and immediately began firing in the direction of the robbers. They returned the fire. Johnson was shot in the side; the ball going clear through his body, entering one side and coming out at the other. The

testimony was contradictory as to which side the ball entered; the State contending that it entered from the left (the side next to the robbers), passing out through the right side, while appellant contended that it entered his right, which was next to Buchanan, coming out at his left side. Two of the robbers were wounded in the fusilade. Immediately after this they fled, and three of them, including appellant, were captured some three days later in Sutton County. This was substantially the State's case against appellant. On his plea of former conviction for an assault with intent to rob, appellant introduced the judgment of former conviction for said assault, which was predicated on his plea of guilty, and the testimony of himself. The testimony was reproduced by the district attorney, T. T. Crosson, and is substantially as follows: That he (appellant) was there and attempted to rob the express car, and that the murder for which he was then being tried was a part of the same transaction. It was in the same crowd, on the same night and place, and under the same circumstances. Upon cross-examination he stated that on the former trial there was no proof of the shooting and death of Lee Johnson; that the attempt to rob was in pursuance of an agreement between appellant and his brother Bill Taylor, Bud Newman, and Pearce Keaton, entered into some time before; that they came to Coleman Junction for that purpose, and attempted to rob the train; that the first thing they did was to shoot off their guns to frighten the parties on the train; that they did this to alarm the expressman, and enable them to reach the express, and that they intended to take the express company's property in the car; that they tried to get the messenger to open the door, but he would not do it; that they did not get a cent.

On this state of case, appellant insists that his plea of former jeopardy should have been submitted to the jury; and he cites us to a number of cases which he insists support his contention,—among others, to Herara v. State, 35 Texas Criminal Reports, 607, and Moore v. State, 33 Texas Criminal Reports, 166. In the first case mentioned, appellant was convicted of an assault with intent to murder, and was afterwards put on trial for robbery. In the last case appellant was first convicted of robbery, and was subsequently put on trial for assault with intent to murder. In both cases the former conviction and the case being tried were shown to be one and the same transaction. In Herera's case the court cite the principles of law covering such matters from Mr. Bishop, indorsing his views. Applying the above test to the case in hand, the court said: "To sustain the robbery, it was necessary to prove the assault. Indeed, the robbery could not be sustained without proof of the same assault for which appellant had previously been convicted on a charge of assault with intent to murder. The offenses are in part, at least, of a like character. They relate to one transaction; and while the charge of robbery contains more of criminality than the other, yet upon the assaulting part of the charge, and on which the robbery could only be sustained (though embraced

in it), the assault with intent to murder is predicated. The offenses, though bearing different names, would appear, by the rule laid down within our constitutional guaranty, the same." Further, from State v. Smith, 43 Vermont, 324, we quote as follows: "While there is a considerable conflict in the authorities upon this subject, we think the rule is well established that when one offense is a necessary element in, and constitutes an essential part of, another offense, and both are in fact but one transaction, a conviction or acquittal of one is a bar to the prosecution for the other." The principles announced in these cases are correct, and applicable to the question then before the court, but does it follow that they are applicable to the facts involved in this case? In Wright v. State, 37 Texas Criminal Reports, 627, where the plea interposed was one of former acquittal, and which, as to the facts, had no particular application to this case, we laid down the following rule adduced from the authorities: "Where the two indictments are of such a character that they are susceptible of being shown to be the same transaction, the plea of former jeopardy is a question for the jury, and not for the court. If, however, the offenses, as charged in the two indictments, show upon their face that they are legally distinct, and incapable of identification by averments, they are separate offenses, and are not susceptible of being established as the same offense." And in such case it is competent for the judge to strike out the plea of former conviction. And in Epps v. State, 38 Texas Criminal Reports, 284, the same rule was adhered to. And see Augustine v. State, ante, p. 59. In the first named case, appellant was being tried on a charge of robbing one E. A. Peifer. He pleaded in bar that he had previously been acquitted in the same transaction for robbing one J. W. Powers. The court struck out the plea of former acquittal, holding that the indictments were for distinct offenses; that, although they may have occurred in the same transaction, yet an acquittal for an assault and robbery of Powers was not a bar for the assault and robbery of Peifer,—they being two distinct persons,—although the two assaults may have been made in the same transaction. In Augustine's case, supra, appellant was put on trial for the murder of Philip Brassell. He set up in bar of the prosecution that he had formerly been tried and acquitted of the murder of one George Brassell, and he alleged they were one and the same transaction. The proof showed that the murder of both said parties occurred in one and the same transaction, yet that they were two distinct acts; that is, each was killed by a distinct shot. It was there held that the former acquittal was not a bar. We there said "that the contention of appellant might be urged with some force if the killing of both parties was done by one and the same act; that is, if the proof showed that but one shot was fired, and it caused the death of Philip and George Brassell, then it might be a good plea in bar. But here the testimony shows that the parties were killed by different acts. Mr. Bishop says: 'Obviously there is a difference between

one volition and one transaction; and, on the view of our combined authorities, there is little room for denial that in one transaction a man may commit distinct offenses of assault or homicides upon different persons, and be separately punished for each.' 1 Bish. New Crim. Law, sec. 1061; Rucker v. State, 7 Texas Crim. App., 549; Chivarrio v. State, 15 Texas Crim. App., 330; Forrest v. State, 13 Lea, 103; Clem v. State, 42 Ind., 420; Teat v. State, 53 Miss., 439." And see Lewis v. State, 1 Texas Crim. App., 323. It is conceded that there is a distinction made in our authorities between a former acquittal and a former conviction growing out of the same transaction; that the principle of carving applies with more force to a former conviction than to an acquittal,—as, where a number of cattle belonging to different owners are stolen at one and the same time and place, a party may be charged by distinct indictments for thefts of the cattle from various owners, and an acquittal as to one will not bar a prosecution alleging theft from another owner, but a conviction for theft from one owner will bar a prosecution for theft from another owner, committed at the same time and place. In this case the facts show, with reference to the former conviction, that it was for a distinct assault, on a distinct charge, to wit, on L. L. White. Appellant was placed on trial in this case for the subsequent killing of Johnson. While these offenses were committed in the same transaction (that is, in the attempt to rob the train), it occurs to us that they were so distinct in point of time and action as to constitute distinct offenses; that is, the proof showed them so.

Appellant objected to that portion of the charge of the court which instructed the jury, in effect, that if defendant and those with him took deceased, Johnson, in custody, and compelled him to go against his will from the engine to the express car, and that same was a place of danger, where deceased's life was exposed, and that while said Johnson was in such place of danger, and they were attempting to rob the train, and using him for that purpose, if Buchanan, in resistance to the perpetration of said attempted robbery, in shooting at the robbers, innocently shot and killed Lee Johnson, not intending to kill him, but intending to kill the parties attempting to perpetrate the robbery, defendant and those with him would be as guilty as if they themselves had shot and killed said Lee Johnson. Appellant objected to this charge of the court on the grounds: (1) That the evidence did not show that defendant and those acting with him placed Johnson in front of the express car to get him shot, but to prevent a shooting; (2) because in front of the express car was not more dangerous than at any other place along the line; (3) because said charge forced the jury to convict, even if they believed that Buchanan killed Johnson, and did not allow them to pass upon that question; (4) it destroyed appellant's innocence, and forced a conviction even if Johnson came to his death by any outside, independent, and unexpected force, by a mere passenger, when he was under no obligation

to shoot; (5) it does not give defendant the benefit of a reasonable doubt as to the existence of facts that would not render him guilty if Buchanan killed Johnson; (6) it does not submit the law of murder in the second degree. This presents a novel question and has never, so far as we are advised, been passed upon in this State; nor do we find an analogous case reported elsewhere. Appellant cites us to two cases in support of his contention. Commonwealth v. Campbell, 7 Allen, 541; Butler v. People (Ill. Sup.) 18 N. E. Rep., 338, 1 Law. Rep. Ann., 211. Both of these were cases of riot, where certain officers (in attempting to quell the riot), in shooting, accidentally killed by-standers who were not engaged in the riot. The prosecution attempted to hold the rioters responsible for the killing by the officers who were opposed to them. The court refused to hold the rioters responsible for the killing by the officers, on the ground that the act was not done by the rioters, nor in pursuance of any design by them; that the sheriff was not acting with them, and they were in nowise responsible for his acts. The court, after citing authorities, say: "That no person can be held responsible for a homicide unless the act was either actually or constructively committed by him; and, in order to be his act, it must be committed by his hand, or by some one acting in concert with him or in furtherance of the common design or purpose. Where the criminal liability arises from the act of another, it must appear that the act was done in furtherance of the common design, or in prosecution of the common purpose for which the parties were assembled or combined together; otherwise, a person might be convicted for a crime, to the commission of which he never assented, and could not be punished upon any principle of justice." And again: "There was no common design or purpose existing between the two defendants and Conrey, the officer. They had not assembled or come together for the commission of any unlawful act. They were enemies, belonging to opposite factions. And we know of no principle upon which it can be held that the defendants are liable for the act of Conrey." And again: "They would be responsible for what they did themselves, and such consequences as might naturally flow from their acts and conduct; but they never advised, encouraged, or assented to the acts of Conrey, nor did they combine with him to do any unlawful act, nor did they in any manner assent to anything he did, and hence they could not be responsible for his conduct towards deceased. It would be a strange rule of law, indeed, to hold a man liable for a crime which he did not commit, which he did not advise, and which was committed without his knowledge or assent, express or implied." This is correct doctrine, and applicable to the facts of those cases. But there are some expressions in the opinion which suggest that there are cases pertaining to another and different rule. For instance, it is said that the parties would be responsible for a homicide actually or constructively committed by them, and they would be responsible for what they did themselves, and such consequences as might naturally

flow from their acts and conduct. If the rioters in said cases had taken the man who was killed, and made a breastwork of him, it would be a different case. We do not understand the doctrine enunciated to apply to a case where the rioters might forcibly make use of another in their design, and cause him to be killed by putting him in a place of danger. The whole question here is one of causal connection. If the appellant here set in motion the cause which occasioned the death of deceased, we hold it to be a sound doctrine that he would be as culpable as if he had done the deed with his own hands. On this subject we quote from 3 Greenleaf on Evidence, section 1420, as follows: "Forcing a person to do an act which causes his death renders the death the guilty deed of him who compelled the deceased to do the act, and it is not material whether the force was applied to the body or to the mind; but, if it were the latter, it must be shown that there was the apprehension of immediate violence, and well grounded, and the circumstances by which deceased was surrounded; and it need not appear that there was any other way of escape, but it must appear that the step was taken to avoid the threatened danger, and such as a reasonable man might take." Again, 1 Russell on Crimes, page 675, says: "Forcing a person to do an act which is likely to produce his death, and which does produce it, is murder, and threats may constitute such force." Mr. Bishop, to the same effect, uses the following language: "He whose act causes in any way, directly or indirectly, the death of another, kills him, within the meaning of the law of felonious homicide. It is a rule both of reason and the law that whenever one's will contributes to impel a physical force, whether another's, his own, or a combined force, proceeding from whatever different sources, he is responsible for the result, the same as though his hand, unaided, had produced it. The contribution, however, must be of such magnitude, and so near the result, that, sustaining to it the relation of contributory cause to effect, the law takes it within its cognizance." See 2 Bish. New Crim. Law, secs. 424, 636, 637, 657, 679, 689, 635; 1 Bish. Crim. Law, secs. 562, 563. To the same effect see 1 Whart. Crim. Law, secs. 152, 167; Whart. on Homicides, secs. 338-340; Adams v. People, 109 Ill., 444. From these authorities, we apprehend, if the robbers had commanded deceased to take his place in front of the incoming train, and by threats and force compelled him to stand there, in order to wreck or stop it, that they might perpetrate a robbery, it will not be controverted that the causal connection between the acts of the robbers and the death of the deceased would be complete, in case deceased had been killed by the train, and that in such case they would be liable for his murder. It occurs to us that the causal connection in proof here was as complete. They caused deceased to go to a place of danger, he protesting. They caused him to do this by force, as the circumstances all indicate, and while he was held in place by their command he was killed by those resisting the robbery, or by the robbers themselves; and in either event we consider

the immediate means of his death immaterial. This is the rule at common law, and is the logic of common sense, and is recognized by our statutes on the subject. Article 77, Penal Code, is as follows: "If anyone by employing a child or other person who can not be punished, to commit an offense, or by any means, such as laying poison where it may be taken and with intent that it shall be taken, or by preparing any other means by which a person may injure himself, and with the intent that such person shall thereby be injured, or by any other indirect means cause another to receive an injury to his person or property, the offender by the use of such indirect means becomes a principal." Article 651 provides: "Homicide is the destruction of the life of one human being by the act, agency, procurement, or culpable omission of another." Article 656: "Although it is necessary to constitute homicide that it shall result from some act of the party accused, yet if words be used which are reasonably calculated to produce and do produce an act which is the immediate cause of death, it is homicide. As for example: If a blind man, a stranger, child or a person of unsound mind be directed by words to a precipice or other dangerous place, where he falls and is killed, or if one be directed to take any article of medicine, food or drink, known to be poisonous, and which does produce a fatal effect,—in these and like cases, the person so operating upon the mind or conduct of the person injured, shall be deemed guilty of homicide." These authorities show that the person, in order to be guilty of homicide, need not do the act of killing directly, but he can produce the cause thus by indirection,—such as by force and threats operating upon the mind of another, and causing that other to take a place of danger, where he is liable to be killed. Mr. Wharton says "that it is not necessary, in order to establish a causal relation between the will and effect, that the effect should be precisely what the party will do. Nor is it necessary that it should be the primary object the offender had in view, as it is sufficient if the object in view was one which could not be obtained without lawbreaking. Nor need such act of lawbreaking be necessary to the execution of the purpose. It may be only incidentally involved in such purpose, yet, if the will be to effect the purpose, lawfully or unlawfully, the will is to be regarded as causing the illegal act." 1 Whart. Crim. Law, sec. 152. So we see that it may not have been, as is contended for by appellant, the primary object of himself and companions to have Johnson killed, without killing anyone. But their act was unlawful. It was a felony. They chose to put deceased in a dangerous place, in order to consummate their purpose, regardless of whether he was killed or not. They put him there in order to effect the robbery, and while they required him to remain at the post assigned him, which was a place of danger, he was shot. His life was taken on account of their direct and lawless act, and they are responsible for his murder, whether it was occasioned by their own volition or by the shots of their adversaries; and their act was the prox-

imate cause of the destruction of his life, and they can not escape the consequences. Our statute defines murder essentially the same as said offense is defined at common law, and our code further makes murder in the perpetration or attempted perpetration of robbery, etc., murder in the first degree; and the only question, therefore, is one of causal connection, and both the common law and our statutes, as we have seen, are in harmony on this proposition. Appellant was indicted as a principal; and the allegation made that he shot and killed deceased; and whether he or one of his companions fired the fatal shot, or the shot which killed him was fired by Buchanan in resistance to their attempt, they using appellant as a means to consummate the robbery, the allegation that appellant, as a principal, fired the shot which killed deceased, is equally correct. We therefore hold that the court did not err in submitting the question of causal connection, to wit, if appellant and those with him in attempting to perpetrate the robbery of the train used deceased for their purposes, and compelled him to occupy a dangerous place in order to consummate their design, then appellant would be responsible for his death. On the contrary, the court should also have instructed the jury that if appellant and those with him, engaged in the perpetration of the robbery, etc., did not compel deceased to go with them and occupy a place of danger in consummating their design, and he was killed by the opposite party, or those resisting the design to rob, then appellant would not be responsible for his death.

There is but one other question that we desire to notice. That is, the admission of the evidence of Pearce Keaton, testified to by him on a trial for murder for the same offense. This testimony was reproduced through the testimony of the district attorney, T. T. Crosson, over appellant's objection. This was excepted to by appellant on the ground that it was hearsay, and because it was not the best evidence, as Keaton could be introduced, and because, at the time Keaton testified, defendant was not present, and had no way of cross-examining him. We have endeavored to discover on what theory this testimony was admitted, and have been unable to solve the question. It could not have been admitted on the ground that appellant and Keaton were coconspirators, because the conspiracy had terminated long before. It could not have been admitted on the ground that appellant may have been an accomplice, and Keaton was his principal, as both, it appears, were principals. And, the testimony being illegal, the attempt of the court to confine it by his charge to the determination of the guilt of Keaton was refuted. The guilt of Keaton and the guilt of appellant were independent facts. Appellant's guilt in nowise depended on Keaton's save that they were both, under the evidence, coconspirators to rob the train. It is said, however, if this testimony was erroneously admitted, that it was harmless, inasmuch as appellant's testimony was reproduced on the trial, and it was in terms similar to Keaton's testimony. The testimony of the two is not similar, as Kea-

ton testified to the whole case, and appellant's testimony only related to the case of assault with intent to rob made by him, and was introduced on his plea of former jeopardy. So far as the record advises us, there is a material difference between the testimony of the two witnesses; but, even if they were the same, because appellant subsequently testified would not justify the admission of illegal testimony of Keaton against him. We are not prepared to say how harmful such testimony was. We know it was incompetent, and that the court ought not to have admitted it; and although the testimony may have been ample for the conviction of appellant outside of the illegal testimony of Keaton, yet we are not able to determine the effect it may have had with the jury; and because of the error in admitting this testimony, the judgment of the court must be reversed, and the cause remanded.

We would say in regard to the dying declarations, in view of another trial, that, under the proof as presented in the record, we think the same were admissible. Sims v. State, 36 Texas Crim. Rep., 154. The judgment is reversed and the cause remanded.

*Reversed and remanded.*

BROOKS, JUDGE.—I agree to the conclusion reached.

DAVIDSON, PRESIDING JUDGE.—I concur in the opinion reversing the judgment on account of the introduction of Keaton's testimony, as set out in the opinion of Judge HENDERSON. In regard to the plea of jeopardy, the court was correct in not submitting that issue for the determination of the jury. The evidence discloses that when the train was stopped by the robbers the engineer and fireman were forced to quit their positions and get out upon the ground. The engineer took refuge under the train, but was ordered out. He demurred on the ground of the danger of being shot. The robbers informed him that they did not propose to hurt or shoot him. He replied that he was not uneasy upon that score, but was afraid of being fired upon from the passenger end of the train. This conversation occurred at the engine. One of the robbers forced the fireman to accompany him thence to the express car, a few feet distant, and the other robbers seem to have taken stations at convenient places to be of assistance in the robbery. After the fireman and the accompanying robber had reached the door of the express car, a demand was made upon the express agent for admission into his car, and threats were made to dynamite the car if admission was refused. About this time Buchanan began firing upon the robbers from the end of the smoking car. The firing became general between Buchanan, on one side, and the robbers on the other. During the fusilade the fireman was shot through the body. There is some conflict in the testimony as to whether the ball entered the right or left side; but the view taken of the testimony renders it immaterial whether Buchanan or the robbers fired the shot

which produced the fatal result. The preponderance of the evidence shows that the fireman was killed by one of the robbers, and not by Buchanan. Buchanan testified that: "I saw one man, I knew was either the fireman or engineer. I did not know which. I knew it was one or the other, from the fact that he had no gun in his hand, and did no shooting. He was off some ten or twelve feet from the express car, and the robber some eight or ten feet from him nearer the car. The other parties with guns were further down the train. I shot at no one who did not either have a gun or who was shooting at me. I did not shoot in the direction of the fireman. He was to the left. I was deliberate in shooting. I had but little ammunition, and wanted to make it count." Joe Gardner testified to a conversation had with the fireman in regard to the shooting, which was introduced as dying declarations: "I asked him how he felt, and Johnson said he was not any better. And I asked him who shot him, and he said: 'I do not know who the man was. Buchanan did not shoot me. It was a man at the trucks near the pilot that shot me.'" The witness Melton testified as did Gardner. The evidence further discloses there was no one at or near the point indicated by deceased except the robbers and the engineer, who was under the train, and who was not armed, and did no shooting. The plea of jeopardy is based on the former conviction of appellant for an assault to rob the express messenger, White. Under the authority of Herara v. State, 35 Texas Criminal Reports, 607; Moore v. State, 33 Texas Criminal Reports, 166; Epps v. State, 38 Texas Criminal Reports, 284, and Augustine v. State, ante, page 59,—this evidence does not authorize the submission of the plea of jeopardy, and the court was correct in not submitting it. Now, suppose appellant had shot and killed White; he could have pleaded the assault to rob White in bar of the prosecution for murder. Herera v. State, supra, and authorities cited. But suppose that after killing White he had turned upon and shot Johnson (deceased); this would have been a distinct offense, and he could not have pleaded a conviction for assaulting White or killing White in bar of a prosecution for killing Johnson. They were distinct, separate offenses. It is immaterial in this case whether defendant or one of his associates killed Johnson, and it is also immaterial whether they or Buchanan killed him. If they placed Johnson, the fireman, in a position where he might be shot, knowing or believing that there was danger of his being shot, and he was shot by an outside or third party, they would be just as responsible as if they themselves had fired the fatal shot. In this particular case they were warned in advance that they might be fired upon from the passenger end of the train, and with this knowledge they placed deceased in a position where he might be shot from that end of the train. And, if Buchanan shot him under these circumstances, they would be responsible for the killing,—as much so as if they themselves had fired the fatal shot. The assault to rob White and the subsequent killing of Johnson being distinct

acts and distinct offenses, defendant could not be held responsible for both. See authorities already cited. I do not care to enter into a discussion of the doctrine of causal connection in this case. I do not believe it has any relation to the facts. For the error committed by the court in permitting the reproduction of Keaton's testimony against defendant Taylor, under the circumstances shown by Judge HEN-DERSON's opinion, the judgment is reversed, and the cause remanded.