WILLIAM HENRY JACKSON AND JAMES WELLS, JR.
*v.* STATE OF MARYLAND

[No. 42, September Term, 1979.]

*Decided December 7, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellants.

*Kathleen M. Sweeney, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The issue for decision is whether the accidental killing of a hostage by a law enforcement officer attempting to apprehend robbers fleeing from an armed robbery while holding the hostage at gunpoint constitutes murder in the first degree on the part of the robbers under the Maryland felony murder statute. We hold that it does.

The issue stems from the contention of each of William Henry Jackson and James Wells, Jr. on direct appeal to the Court of Special Appeals that his plea of guilty of the murder in the first degree of Bernard Sugar was accepted by the Circuit Court for Worcester County [1] improperly because "the factual statement serving as a basis for the guilty plea failed to demonstrate guilt of the crime for which the plea was entered." Upon acceptance of the pleas, the court found each defendant guilty of murder in the first degree and sentenced him to life imprisonment. In an unreported opinion, the Court of Special Appeals affirmed the judgments. It found no error in the acceptance of the pleas because it thought that the killing of Sugar was attributable to Jackson and Wells as murder in the first degree under the felony murder statute

---

1. The case was originally in the Circuit Court for Baltimore County. Upon suggestion for removal the court ordered that the case be transmitted for trial to the Circuit Court for Worcester County. Maryland Rule 744.

of this State. We granted certiorari. The issue for decision
was raised by the sole question presented in the petition for
the writ: "Did the Court of Special Appeals err in concluding
that the Maryland Felony Murder Statute makes a felon liable
for a policeman's killing of a victim?"

I

When the case came on for trial, Jackson and Wells pleaded
"guilty to murder in the first degree" under the first count
in the indictment returned against them. The prosecutor
informed the court that the pleas were tendered pursuant to
a plea bargain whereby the State agreed to recommend that
a life sentence be imposed as to each defendant and to nol pros
all other outstanding charges relating to the robbery and
murder.[2] The court, through extensive inquiry of the
defendants, placed on the record an affirmative showing that
the plea of each of them was made voluntarily,
unconditionally, and with an intelligent understanding of the
nature of the offense and the possible consequences of the
effect of the pleas. There remained, in order for the pleas to
be effectively accepted as meeting the constitutional
standard, that the State demonstrate a strong factual basis
for them. See Williams v. State, 10 Md. App. 570, 571-574, 271
A.2d 777 (1970), cert. denied, 261 Md. 730 (1971); McCall v.
State, 9 Md. App. 191, 194-202, 263 A.2d 19, cert. denied, 258
Md. 729 (1970). To do this, the State proffered the evidence
it would adduce were it to present its case in chief. We
summarize this proffer.

Bernard Sugar and Charlotte Farber operated a jewelry
shop located in a shopping area in the 9100 block of the
Baltimore National Pike in Howard County. About 9:30 a.m.
on 29 April 1977 Jackson and Wells came in. Each brandished
a handgun and forced Sugar and Farber to lie on the floor.
The robbers took jewelry valued at more than $10,000 from
a safe and display cabinets.

At 10:05 a.m. one Charlene Kelly entered the store, asked
for Farber, and was told by Wells that she was not there but

2. The State fulfilled its agreement.

would return in half an hour. Suspicious, Kelly left the store and contacted the police. Leonard Shipley, a mailman, appeared on the scene. He also became suspicious, but as he attempted to leave the store Wells stopped him at gunpoint. The two men struggled, Wells struck Shipley on the head and forced him to join Sugar and Farber on the floor. At 10:15 a.m. Howard County policemen arrived on the scene and announced their presence. Wells started to leave by the front door, saw the police, and ran back in. Both Wells and Jackson attempted to leave by the rear door, were deterred by the police and retreated into the store.

Unable to find another escape route, Wells grabbed Farber, held his handgun to her neck and said, "You do what I do. I walk, you walk, I run, you run. If they shoot me, you're dead. If they shoot me I'm going to kill you." Wells held her in a headlock and kept the gun to her neck. Jackson grasped Sugar, holding him in a similar manner at gunpoint. Jackson and Wells, using Farber and Sugar as shields, left the store by the rear door, disregarding the order of the police to stop and release their hostages.

The robbers forced Farber and Sugar to get in a police car with them and drove away. Before the car reached the exit from the shopping area, gunfire by the police disabled it. The felons stole another police car, and with Jackson at the wheel and their hostages still held at gunpoint, drove away amid a fusilade of shots by the police. They pulled into the westbound lane of State Route 99, forced a civilian to stop her car, entered it with the hostages and, with Jackson driving, speeded away, pursued by members of the Howard County Police Department and the Maryland State Police. The fleeing felons evaded a roadblock by driving across a plowed field and eventually proceeded on Interstate 70 towards Baltimore with the police close behind. Wells, holding Farber by the neck and keeping his gun to her head, forced her to kneel on the back seat with her face in the rear window, thus exposing her to gunfire from the pursuing police cars. The chase continued on Interstate 70, on the Baltimore Beltway and east on Route 40 to Ingleside Avenue in Baltimore County. Gunshots by the

police had punctured the fleeing vehicle's tires, and it was finally brought to a halt by a roadblock.

Police manning the roadblock, unaware of the presence of the hostages, fired at the car. Law enforcement officers of three counties and the State converged on the scene and placed the car under heavy gunfire. Officer Wayne White of the Howard County Police Department, armed with a shotgun, ran to the car and jumped on its hood. At that moment Wells had his arm out of a window of the car, waving a revolver in his hand. White swung his shotgun across the top of the car in an attempt to strike Well's arm and knock the revolver from his hand. The shotgun discharged. Sugar was lying on the front seat of the car. The pellets from the shotgun struck him in the back of his neck, and he died as a result of that wound. After a struggle, Jackson was seized from the driver's seat of the vehicle. Wells was taken from the rear seat. Two .38 caliber revolvers were recovered. The one located in the area in which Jackson was taken into custody contained five live rounds and one spent round. It was cocked. The other gun was found on the rear seat. It was fully loaded.

Jackson and Wells had no "additions or alterations" to make to the proffer. Defense counsel said: "We would stipulate that that is what the State's witnesses would say if they were called to testify." The court stated that it did not have "any problem then in finding each of [the defendants] guilty under the First Count," which charged the murder of Sugar in the first degree. The court observed:

> I think any jury would have found you guilty of murder in the first degree, and, of course, you would have been found guilty, unquestionably, of the kidnapping charges. You have run afoul of the felony-murder rule in Maryland. And if one is killed as a result of the perpetration of a crime of the character in which you two perpetrated in Ellicott City, then you are guilty of murder in the first degree.

The court characterized the case as "strange" and "unusual" in that the fatal shot had not been fired by either Jackson or Wells and was "apparently accidental."

## II

At the common law, to which the inhabitants of Maryland are entitled, Md. Const. Declaration of Rights, Art. 5, homicide is the killing of a human being by another human being; criminal homicide is homicide without lawful justification or excuse; criminal homicide with malice aforethought is murder; malice aforethought is established, *inter alia,* upon commission of criminal homicide in the perpetration of, or in the attempt to perpetrate, a felony.[3] *State v. Frye,* 283 Md. 709, 712-713, 393 A.2d 1372 (1978); *Newton v. State,* 280 Md. 260, 268-269, 373 A.2d 262 (1977); *Stansbury v. State,* 218 Md. 255, 260-261, 146 A.2d 17 (1958); *Wood v. State,* 191 Md. 658, 666-667, 62 A.2d 576 (1948); *Warren v. State,* 29 Md. App. 560, 566, 350 A.2d 173 (1976); *Evans v. State,* 28 Md. App. 640, 700, 349 A.2d 300 (1975), *aff'd,* 278 Md. 197, 362 A.2d 629 (1976); 4 W. Blackstone, Commentaries *195-201; Clark and Marshall, A Treatise on the Law of Crimes §§ 10.04 — 10.07 (7th ed. 1967); R. Perkins, Criminal Law pp. 28-45 (2d ed. 1969). Thus, at common law, homicide arising in the perpetration of, or in the attempt to perpetrate, a felony is murder whether death was intended or not, the fact that the person was engaged in such perpetration or attempt being sufficient to supply the element of malice. *Stansbury,* 218 Md. at 260. "The doctrine has repeatedly been recognized and applied in this country, and is to be regarded as still in force, except where it has been

3. There is suggestion that the common law rule ultimately required that the underlying felony be one "dangerous to human life." Lindsay v. State, 8 Md. App. 100, 105, n. 6 (1969), 258 A.2d 760, *cert. denied,* 257 Md. 734 (1970). But Blackstone did not qualify the underlying felony. 4 W. Blackstone, Commentaries *200. And Clark and Marshall, A Treatise on the Law of Crimes § 10.07 (7th ed. 1967) includes burglary and larceny among the felonies within the common law rule. In any event, the underlying felony here, which we ascertain *infra* to be kidnapping, fits the category of one dangerous to human life, and we need not now be concerned with whether the qualification was recognized when the common law of England was constitutionally incorporated into our law.

expressly abrogated by statute." Clark and Marshall, *supra,* § 10.07, p. 657. The doctrine has not been abrogated by statute in this State. The Maryland statutes with respect to murder "do not create any new crime, but merely classify murder, as it was known at common law, into degrees.... [T]he 'common law sense is left unimpaired; the measure of punishment only is sought to be graduated according to the circumstances under which it was committed.' " *Stansbury* at 260, quoting *Davis v. State,* 39 Md. 355, 374 (1874).

At common law, there were no degrees of murder. *Wood,* 191 Md. at 666; Clark and Marshall, *supra,* § 10.09, p. 681. It is by the prescriptions of the so-called "felony-murder" statute, Md. Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.) Art. 27, § 410, that, in this State, "[a]ll murder which shall be committed in the perpetration of, or attempt to perpetrate" certain designated felonies, including "kidnapping as defined by [§ 337 of Art. 27]... shall be murder in the first degree."

## III

The evidence as proffered was sufficient to prove the *corpus delicti* of murder in the first degree if the killing of Sugar may be attributed to Jackson and Wells. It is manifest that, at the time Sugar was killed, Jackson and Wells were perpetrating a felony. Their seizing Sugar and Farber and carrying them to some other place was the felony of kidnapping proscribed by Md. Code (1957, 1976 Repl. Vol.) Art. 27, § 337. *Midgett v. State,* 216 Md. 26, 38-40, 139 A.2d 209 (1958). The killing was, of course, homicide, as it was the killing of a human being by another human being. It was, as to Jackson and Wells, criminal, being neither justifiable nor excusable. Because the criminal homicide was committed in the perpetration of a felony, malice was established, making it murder. The murder was in the first degree because the felony being perpetrated in its commission was kidnapping. The issue for decision, therefore, boils down to whether Jackson and Wells were criminal agents in the murder. If the murder were legally attributable to them, the pleas of guilty to murder in the first degree would have a factual basis, and as they otherwise met the constitutional standard, the trial

court would not have erred in accepting them. In short, the question here becomes one of causal relationship.

As the trial judge observed, the case is unusual in that the fatal shot was fired accidently by a police officer and not by the felons perpetrating the kidnapping. But the case is not unique. Application of the felony-murder doctrine to circumstances other than those in which a death is directly caused by the felon perpetrating the underlying felony or his accomplice has harassed courts and excited commentators to critical analyses. *See* cases collected in Annot., 56 A.L.R.3d 239 (1974). *See, e.g.:* Crum, *Causal Relations and the Felony-Murder Rule,* 1952 Wash. U.L.Q. 191; Hitchler, *The Killer and his Victim in Felony-Murder Cases,* 53 Dick.L.Rev. 3 (1948); Moesel, *A Survey of Felony Murder,* 28 Temp. L.Q. 453 (1955); Morris, *The Felon's Responsibility for the Lethal Acts of Others,* 105 U.Pa.L.Rev. 50 (1956); Perkins, *The Law of Homicide,* 36 J.Crim.L., C. & P. S. 391 (1946); Perkins, *A Re-Examination of Malice Aforethought,* 43 Yale L.J. 537 (1934); *The Felony Murder Rule: In Search of a Viable Doctrine,* 23 Cath.Law. 133 (1978); 24 Ark.L.Rev. 342 (1970); 9 Duq.L.Rev. 122 (1970); 22 Hastings L.J. 1327 (1971); 14 Santa Clara L. 97 (1973); 22 Stan.L.Rev. 1059 (1970); 21 Syracuse L.Rev. 1321 (1970); 5 Val.L.Rev. 676 (1971).

Courts have followed tortuous paths endeavoring to arrive at a sound rationale applicable to a variety of circumstances in determining whether those persons perpetrating the underlying felony are responsible for the lethal act. For example, California enunciated as a test to ascertain if a defendant is guilty of murder when, during the perpetration of a felony, someone is killed by a person other than the defendant or an accomplice, whether the killing was in response to malicious conduct additional to the underlying felony. *People v. Washington,* 62 Cal.2d 777, 402 P.2d 130, 44 Cal. Rptr. 442 (1965); *People v. Gilbert,* 63 Cal.2d 690, 408 P.2d 365, 47 Cal. Rptr. 909 (1966). But then it made the test inapplicable to cases where the victim was being used by the defendant or an accomplice as a shield. It declared that the function of the test was "to provide the trier of fact with a guideline for determining whether the malicious conduct,

rather than the underlying felony, *proximately* caused the victim's death. In a shield case this determination may be made without employing that test." *Pizano v. Superior Court of Tulare Cty.,* 21 Cal.3d 128, 577 P.2d 659, 661, 145 Cal. Rptr. 524, 526 (1978). *Cf. People v. Antick,* 15 Cal.3d 79, 539 P.2d 43, 123 Cal. Rptr. 475 (1975); *Taylor v. Superior Court,* 3 Cal.3d 578, 477 P.2d 131, 91 Cal. Rptr. 275 (1970).

Pennsylvania, on the other hand, went the other way. By dictum in *Commonwealth v. Moyer,* 357 Pa. 181, 53 A.2d 736 (1947) and by a holding in *Commonwealth v. Almeida,* 362 Pa. 596, 68 A.2d 595 (1949), *cert. denied,* 339 U.S. 950 (1950), a defendant could be found guilty of murder even though the fatal bullet was fired by a police officer in opposition to the felony. The proximate cause theory of murder was applied. "[H]e whose felonious act is the *proximate cause* of another's death is *criminally* responsible for that death. . . ." *Almeida,* 362 Pa. at 603. *Almeida* changed the rule previously followed that in order to convict for felony-murder, the killing must have been done by the defendant or by an accomplice. In *Commonwealth ex rel. Smith v. Myers,* 438 Pa. 218, 261 A.2d 550 (1970), there was a prosecution for murder arising from the death of an off-duty policeman who was shot while attempting to thwart the escape of the defendant and co-participants in an armed robbery. The trial judge had charged the jury that even if the victim was killed by another policeman, who was attempting to prevent the robbery, or was returning the fire of the felons, the felons would be guilty of murder. A majority of the court, over vigorous dissent, held that the instruction denied a fair trial. The way had been paved for this ruling by extending *Almeida* in *Commonwealth v. Thomas,* 382 Pa. 639, 117 A.2d 204 (1955) and by overruling *Thomas* in *Commonwealth v. Redline,* 391 Pa. 486, 137 A.2d 472 (1958). So the court in *Myers* expressly overruled *Almeida,* stating that it gave "Almeida burial, taking it out of its limbo, and plunging it downward into the bowels of the earth." 261 A.2d at 559-560. Thus *Myers* reverted the Pennsylvania law to the pre-*Almeida* rule — to convict of murder under the felony-murder doctrine, the killing must be done by the hand of the felon or an accomplice.

Four score years ago the Court of Criminal Appeals of Texas was faced with a case comparable to the one before us. Robbers stopped a train to rob the express car. They forced one of the trainmen to stand in a place of danger, where he was accidentally shot and killed by a passenger or by one of the robbers. Texas followed essentially the common law definition of murder and by statute made murder in the perpetration or attempted perpetration of certain felonies, including that of robbery, murder in the first degree. The court held that the causal connection was complete. It may not have been, the court observed, the primary object of the robber, Taylor, and his companions to have the trainman killed, but

> their act was unlawful. It was a felony. They chose to put deceased in a dangerous place, in order to consummate their purpose, regardless of whether he was killed or not. They put him there in order to effect the robbery, and while they required him to remain at the post assigned him, which was a place of danger, he was shot. His life was taken on account of their direct and lawless act, and they are responsible for his murder, whether it was occasioned by their own volition or by the shots of their adversaries; and their act was the proximate cause of the destruction of his life, and they cannot escape the consequences. [*Taylor v. State,* 41 Tex. Crim. 564, 55 S.W. 961, 965 (1900).]

The holding was followed by the court with respect to the conviction for the same murder of another of the robbers, one Keaton. *Keaton v. State,* 41 Tex. Crim. 621, 57 S.W. 1125 (1900). "[C]ertainly [Keaton] would be responsible for the reasonable, natural, and probable result of his act, to wit, placing deceased in a place of danger, where he would probably lose his life." *Id.* 57 S.W. at 1129.

More recently, in *Wilson v. State,* 188 Ark. 846, 68 S.W.2d 100 (1934), the Supreme Court of Arkansas had before it circumstances of a killing substantially the same as those in the case before us. John Wilson and two accomplices were

engaged in robbing a bank when the town marshall arrived on the scene. The robbers realized that they had been discovered and hastened to leave with their loot. One of them, with drawn pistol, forced a bank teller to go with him. As they left the bank, there was an exchange of gunfire. The teller was accidentally killed by the marshall. Wilson was convicted of the teller's murder. The question, of first impression in that court's jurisdiction, was the criminal responsibility of Wilson for the teller's death.

The court agreed with the principle expressed in cases in other jurisdictions: "A attempts to rob B. B, while resisting the attempted robbery, shoots at A and accidentally kills C who is an innocent third party. A cannot be convicted of the murder of C." The court noted the reason for the principle was that "[i]n order that one may be guilty of homicide, the act must be done by him actually or constructively, and that cannot be, unless the crime be committed by his own hand, or by the hands of someone acting in concert with him, or in furtherance of a common object or purpose." *Id.,* 68 S.W.2d at 101-102, quoting *Commonwealth v. Moore,* 121 Ky. 97, 88 S.W. 1085, 1086 (1905). But the court did not think that the principle was applicable to the facts before it.

> Here the robbers compelled [the teller], over his objections and against his will, to accompany them from a place of safety, so far as outsiders were concerned, to a place known by them to be a place of danger from those on the outside. They knew they had been discovered and apprehended danger from the outside, else they would not have taken [the teller] with them. They wished to use him as a breastwork, as it were, or they thought perhaps the outsiders would not shoot at them for fear of killing [the teller]. In doing this they committed another crime, kidnapping, and caused [the teller's] death. *[Wilson,* 68 S.W.2d at 102.]

The court looked to *Taylor v. State, supra,* and *Keaton v. State, supra,* noting: "The reasoning in these cases appears

to us to be sound and unanswerable." 68 S.W.2d at 102.[4] Therefore,

> [h]aving forced [the teller] to accompany them in an attempt to escape, another felonious act, and having compelled him to take a known place of danger, as they had already been discovered by the marshall and others, they must abide the consequences of their unlawful act, although the result was not intended." [Id.]

The court concluded:

> [The robber's] action in forcing [the teller] to a place which was known by [the robber] to be perilous was just as much the cause of [the teller's] death as if [the robber] had himself fired the fatal shot." [Id.]

We are satisfied that the view expressed in *Wilson* upon application of the rationale of *Taylor* and *Keaton* is the rule at common law, is within the contemplation of our murder statutes, and is the logic of common sense.

The basic premise is that "[a] person is only criminally liable for what he has caused, that is, there must be a causal relationship between his act and the harm sustained for which he is prosecuted." 1 Wharton's Criminal Law § 68 (Anderson, 1957). But

> [i]t is not essential to the existence of a causal relationship that the ultimate harm which has resulted was foreseen or intended by the actor. It is sufficient that the ultimate harm is one which a reasonable man would foresee as being reasonably related to the acts of the defendant. . . . It is not necessary that the defendant personally inflict harm upon the victim. . . . To constitute the cause of the

---

4. The court thought that the only difference between the case before it and the Texas cases was that the robbers in the former were using the teller as a breastwork in an attempt to escape, after having robbed the bank, whereas in the latter the robbers were using the trainman during the attempted robbery. "This can make no difference, for the conspiracy to rob the bank had not been completed until they had made their escape." Wilson v. State, 188 Ark. 846, 68 S.W.2d 100, 102 (1934).

harm, it is not necessary that the defendant's act be the sole reason for the realization of the harm which has been sustained by the victim. The defendant does not cease to be responsible for his otherwise criminal conduct because there were other conditions which contributed to the same result." [*Id.*]

Clark and Marshall, *A Treatise on the Law of Crimes,* § 4.01, p. 209 (7th ed. (1967)), puts it this way: "An accused is not responsible for the death of another, unless that fatal harm was caused by the defendant's act or omission, or by the behavior of persons whose actions are attributable or chargeable to the defendant."

Actual causation may be examined in terms of the *sine qua non.* R. Perkins, Criminal Law 688 (2d ed. 1969). "In order that conduct be the actual cause of a particular result it is almost always sufficient that the result would not have happened in the absence of the conduct; or, putting it another way, that 'but for' the antecedent conduct the result would not have occurred." W. La Fave & A. Scott, Handbook on Criminal Law 249 (1972). So examined here, there can be no doubt that "but for" the acts of Jackson and Wells — committing the armed robbery, kidnapping Sugar and Farber to use them as hostages, forcing them against their will into a position of known grave danger, attempting to elude apprehension by fleeing in stolen automobiles, all the while purposely exposing their hostages to gunfire, and, when ultimately halted in their flight by police action, resisting arrest — "but for" those acts, Sugar would not have been killed. Although the lethal shot was through the actions of a police officer attempting to apprehend the felons, the behavior of that officer was chargeable to Jackson and Wells. They were just as much the cause of Sugar's death as if each had fired the fatal shot. Their acts themselves produced the intervening cause of Sugar's death, and the result is not to be considered remote and was foreseeable. Clark and Marshall, *supra,* § 4.01, p. 213. For discussion generally of causes intervening between an accused's act and the harm *see id.* pp. 208-219; La Fave & Scott, *supra,* 257-263; Perkins, *supra,* 708-725. *See also Mumford v. State,* 19 Md. App. 640, 313 A.2d 563 (1974);

*Letner v. State,* 156 Tenn. 68, 299 S.W. 1049 (1927); *State v. Myers,* 7 N.J. 465, 81 A.2d 710 (1951). The causal relationship between the acts of Jackson and Wells and the death of Sugar for which they were prosecuted is clear and direct.[5]

## IV

We have determined that, in the circumstances surrounding the death of Sugar as set out in the undisputed factual statement given to the trial court, even though the fatal shot was not fired by Jackson and Wells, but accidentally by a police officer attempting lawfully to arrest them, their behavior established such a causal relationship with respect to the death as to make them criminally liable therefor. We have further determined that, in light of their criminal agency, the killing of Sugar was the crime of murder in the first degree with regard to them. It follows that the factual statement serving as a basis for the plea of guilty of Sugar's murder in the first degree entered by each of Jackson and Wells did "demonstrate guilt of the crime for which the plea was entered," and that the pleas were properly accepted by the trial court.

In affirming the judgments, the Court of Special Appeals relied on *Mumford v. State, supra.* In *Mumford,* the court stated that under the felony-murder statute "[e]ach person engaged in the commission of the criminal act bears legal responsibility for all the consequences which naturally and necessarily flow from the act of each and every participant," but it recognized that the doctrine was circumscribed by "causation" requirements — "there must be direct causal connection between the homicide and the felony." 19 Md. App.

---

5. 1 Wharton's Criminal Law § 253 (Anderson, 1957) suggests that the general rule is that the defendant is not responsible for a death caused by the shots of a police officer, but that "[t]he general rule recognizes two exceptions in which the felon is guilty of first degree murder, namely, when he uses the victim as a shield, and when he compels the victim to occupy a place or position of danger." The authority given for the "exceptions" is Wilson v. State, 188 Ark. 846, 68 S.W.2d 100 (1934); Taylor v. State, 41 Tex. Crim. 564, 55 S.W. 961 (1900); and Keaton v. State, 41 Tex. Crim. 621, 57 S.W. 1125 (1900). We do not read those cases as setting out exceptions to a "general rule" but as deeming such acts to establish a causal relationship with the harm sustained sufficient to make the felon criminally liable.

**444**

at 643-644. As we have seen, *Mumford* accurately stated the law, and the intermediate appellate court correctly applied that law to the facts here. We hold that the Court of Special Appeals properly affirmed the judgments of the Circuit Court for Worcester County.

> *Judgment affirmed; costs to be paid by appellants.*