## George JOHNSON *v.* STATE of Arkansas

5663                                     482 S.W. 2d 600

Opinion delivered July 17, 1972

*William F. Sherman,* for appellant.

*Ray Thornton,* Atty. Gen., by: *James A. Neal,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellant George Johnson was charged with and convicted of murder in the first degree on May 22, 1970. He presents seven points for reversal. Upon consideration of them and the entire record in the case, we find reversible error in the failure of the circuit court judge to give a requested instruction.

Appellant was charged by information which, after amendment, read:

> Comes Richard B. Adkisson, Prosecuting Attorney within and for Pulaski County, Arkansas, and in the name, by the authority, and on behalf of the State of Arkansas information gives accusing GEORGE JOHNSON, JR., of the crime of MURDER-FIRST DEGREE committed as follows, to-wit: The said GEORGE JOHNSON, JR., in the County and State aforesaid, on or about the 22nd day of May, A.D. 1970, did unlawfully, feloniously, cause the death of Vicki Siscoe while in the perpetration of a Burglary, against the peace and dignity of the State of Arkansas.

Mr. and Mrs. W. A. Siscoe and their daughter Vicki[1] arrived home from the Siscoe grocery store on the night of May 22, 1970, at about 10:45 p.m. Mrs. Siscoe drove her vehicle into the driveway, parked it and awaited her daughter

---

[1] The daughter's name appears as "Vicky" in the transcript of the testimony. We use the spelling in the information throughout.

and husband, who followed her in a vehicle driven by the husband. He stopped his car and the daughter got out, opened the front door and entered the Siscoe dwelling. Her father heard her screaming inside the house and ran inside, armed with a .38-caliber revolver, where he became aware of the presence of an intruder who threatened to kill him and began firing a weapon. When Siscoe returned the fire, the intruder grabbed Vicki, swung her around as a body shield and a scuffle ensued during which Siscoe fired, or attempted to fire over the intruder's shoulder. Shots were fired by the father and by at least one intruder. In the exchange of gunfire, Vicki Siscoe was struck by a bullet from her father's weapon and another from a .22-caliber weapon obviously fired by the intruder. The state medical examiner testified that, in his professional opinion, Vicki's death was caused by a large caliber bullet of the same type as a .38-caliber slug exhibited to him. Both appellant, who admitted his presence in the house at the time, and W. A. Siscoe were wounded. All three wounded persons were admitted to Baptist Medical Center, where Vicki Siscoe died.

Fingerprints lifted from the .22-caliber pistol were not Johnson's. There was obvious evidence of a forcible entry into the house by the breaking of a window and the removal of a window screen. The ransacking of dresser drawers and the opening of two piggy banks therein were clear indications of larcenous intent of at least one of the intruders. Fingerprints lifted from the windowsill were not Johnson's.

Siscoe, while in a condition of near hysteria, described the intruder he saw to Officer L. G. O'Kelley of the Little Rock police force as a slender black male wearing a mask. The officers who came to the house found the den spattered with blood and in a disorderly condition. Officer Paul Plummer found a trail of blood from the back door and through the backyard. Two .38-caliber bullets were removed from appellant's body at the hospital. One of them was positively identified by ballistics tests as having been fired from W. A. Siscoe's pistol. Bullet holes were found in a corner of the den and on the sidewall of a storage room opposite the den.

Siscoe was unable to describe the clothing of this intruder, but positively identified Johnson as the person with whom he exchanged fire in the house and at whom he fired outside the house, after the intruder left. Officers were unable to serve subpoenae, issued at appellant's instance, on Eddie Jackson, Lacie Gordon or Benny Kelley. George Johnson testified that he went to the Siscoe house with these three and was admitted by Jackson, who had gained entry through a window which he unlocked and raised after he had broken a pane with a pistol. Johnson testified that he had never owned a gun and that he did not have a gun of any kind while at the Siscoe house, but that Jackson did. Johnson saw Vicki Siscoe come into the house and walk toward that portion where he and Jackson were. According to Johnson, he never fired any weapon on that night but Jackson did. Johnson said that he was trying to open the back door, as instructed by Jackson, when he was struck by one bullet. He said he was hit by another as he fled through the backyard. According to Johnson, Jackson was entering a closet when last seen by him.

There is no doubt that if the Siscoe version of the shooting is correct the felony-murder rule would apply and it would be proper to say that Johnson was guilty of either first degree murder or nothing at all. Both of the elder Siscoes identified Johnson as the assailant. But this ignores appellant's version of the case. Under his theory, Johnson might not be guilty of the felony-murder. There is little doubt that Vicki Siscoe's father fired the fatal shot, and Johnson denies that he was a participant in the crime.

We cannot agree that appellant was entitled to a directed verdict on the felony-murder charge. He contends that since neither he nor the person he claimed to have accompanied to the Siscoe house fired the fatal shot, the killing of Vicki Siscoe could not constitute this type of murder. The most analagous case we have is *Wilson* v. *State,* 188 Ark. 846, 68 S.W. 2d 100. There we agreed with the following principle stated in cases from other jurisdictions:

A attempts to rob B. B, while resisting the attempted robbery, shoots at A and accidentally kills C who is an

innocent third party. A cannot be convicted of the murder of C. The reason for the rule in such a case is stated in the Kentucky case as follows: "In order that one may be guilty of homicide, the act must be done by him actually or constructively, and that cannot be, unless the crime be committed by his own hand, or by the hands of some one acting in concert with him, or in furtherance of a common object or purpose."

We did not agree, however, that the principle of these cases applied. In *Wilson*, we recognized and applied the "shield" or "breastwork" theory. Under this theory the acts of persons attempting to escape when a police officer discovered them in the process of robbing a bank, taking a teller from his place of safety in the bank at the point of a pistol, and putting him in a place of danger from gunfire by the officer, thinking perhaps that their pursuers would not shoot at them for fear of killing Guthrie, were held to constitute murder. Following the reasoning of two Texas decisions, *Taylor* v. *State*, 41 Tex. Cr. R. 564, 55 S.W. 961 (1900), and *Keaton* v. *State*, 41 Tex. Cr. R. 621, 57 S.W. 1125 (1900), we held that the fleeing felons must abide the consequences of their unlawful act, even though the result was not intended, and the act of Wilson in forcing the teller to a place known by the robber to be perilous was just as much a cause of the teller's death when he was accidentally shot by the police officer as if Wilson himself had fired the fatal shot. We held that since under Ark. Stat. Ann. § 41-2202 (Repl. 1964), the manner of killing is not material, this act constituted murder, both at common law and under the statute. We equated this action with homicide committed by exposing a helpless child to inclement weather, forcing a sick and weak sailor to go aloft, causing one to jump from a moving train, directing a blind man in a direction so that he walks off a precipice or striking a deceased blows which caused him to fall from a wagon in which he was riding, so that a wheel of the wagon passed over his body, which, of course, would constitute first degree murder, if the requisite circumstances exist. Examination of the authorities cited in *Wilson* clearly demonstrates the basis for the distinction we made there.

There is substantial evidence here that the intruder who used Vicki Siscoe as a shield was guilty of murder as defined in §§ 41-2201 and 41-2202. Consequently, there was evidence that the intruder committed murder in the preparation of or in the attempt to perpetrate burglary. Since both Mr. and Mrs. Siscoe identified Johnson as this intruder, the evidence was sufficient to present a jury question on felony-murder. We might well end our inquiry into the felony-murder charge here, except for the testimony by Johnson that he did not enter the Siscoe house with the intent to commit larceny, and did not know that his companion Jackson had any intention to do anything there except collect some money due him, until Jackson broke a window to gain entrance. There is also testimony by Johnson that he did not in any way participate in the shooting or in the utilization of Vicki Siscoe as a shield, if indeed this happened.

This brings us to a consideration of Johnson's responsibility for the acts of his companion. In doing so, we must say that there was sufficient evidence from which the jury might well have found that Jackson and Johnson entered the Siscoe house in the execution of a conspiracy or common design or plan to do so with the joint object or purpose of committing larceny therein. Each conspirator or participant is responsible for everything done which followed directly and immediately in the execution of the common purpose as one of its probable and natural consequences. *Bosnick* v. *State*, 248 Ark. 846, 454 S.W. 2d 311. The burglary and larceny, if committed, or the scheme to commit these crimes, if it existed, did not terminate until the perpetrators had left the scene. *Clark* v. *State*, 169 Ark. 717, 276 S.W. 849. The acts of the participants in an effort to escape are a part of the continuous scheme or conspiracy and the act of one is the act of all. *Wilson* v. *State*, supra; *Clark* v. *State*, supra; *Maxwell* v. *State*, 188 Ark. 111, 64 S.W. 2d 79. In the cases cited in *Wilson* from other jurisdictions, it is clearly recognized that the law holds a participant in a crime responsible for the acts of another acting in concert with him or in the furtherance of a common object, design or purpose. *Commonwealth* v. *Campbell*, 7 Allen 541, 89 Mass. 541 (1863); *Butler* v. *People*, 125 Ill. 641, 18 N.E. 338 (1888); *Taylor* v. *State*,

41 Tex. Cr. R. 564, 55 S.W. 961 (1900); *Keaton v. State,* 41 Tex. Cr. R. 621, 57 S.W. 1125 (1900); *Commonwealth v. Moore,* 121 Ky. 97, 88 S.W. 1085 (1905).

We do not agree that appellant was entitled to any instruction on the lesser degrees of homicide in this case. *Clark* v. *State,* supra. See also, *Bosnick* v. *State,* 248 Ark. 846, 454 S.W. 2d 311; *Murray* v. *State,* 249 Ark. 887, 462 S.W. 2d 438. Johnson was either the burglar seen and fired at by Siscoe inside the house, or a confederate of one whose acts constituted a felony-murder or he was innocent. There is no evidence that would have justified an instruction on the lesser degrees of homicide.

Appellant complains that the court failed to give his requested instructions No. 8 and No. 18. They were:

For a defendant to be guilty of murder under the felony murder rule, the act of killing must be committed by the defendant or by his accomplice acting in the furtherance of a common design. (No. 8)

In order that one may be guilty of a homicide, the act must be done by him actually or constructively, and that cannot be unless the crime be committed by his own hands or by the hands of some one acting in concert with him, or in furtherance of a common object or purpose. (No. 18)

Appellant was entitled to have a correct instruction bearing on his theory of the case, if there is any supporting evidence and if it is not covered in other instructions given by the court. *Lighter* v. *State,* 157 Ark. 261, 247 S. W. 1065. Appellant was not entitled to both instructions. The first probably should not have been given because the words "act of killing" might have been misleading and confusing to the jurors, causing some of them at least to believe that, in order to be guilty, either the defendant or his accomplice must have fired the weapon that caused the death. Number 18, however, is a direct quotation from *Wilson* v. *State,* supra, and is a correct declaration of the law. It was necessary that the jury find that the act, i.e., putting Vicki Siscoe in the place of known danger as a shield or breastwork, was done by Johnson, or by someone acting in concert with him, or in the furtherance of a

common object or purpose. The jury was not so advised in any other instruction. It may well be that the state would have desired a modifying or explanatory instruction if No. 18 had been given, or that appropriate clarifying language be added, so that the jury would know that it was not necessary that appellant fire the shot that caused the death or that he have any knowledge or intent that the deceased would be put in the position of known danger. Still, it was a correct declaration of law. The only instruction remotely approaching this subject would not have told the jury that an unlawful act by the alleged accomplice would not render Johnson responsible for the consequences unless the two were acting in concert or in the furtherance of a common object or purpose. Because of the failure to give an instruction covering this phase of the case, we must reverse the judgment.

We will now consider only those alleged errors which may arise in a retrial of the case.

Appellant asserts that the court failed to give any instruction defining the intent necessary for the crime of burglary, i.e., the intent to commit a felony or larceny. No request for such an instruction was made until the jury returned to the courtroom after deliberating for some time, asking a clarification of the word "intent" in the instructions given which had been a virtual recitation of the burglary statute. Even then, the appellant offered no instruction except a dictionary definition that could have proved of little or no help to the jury. It appears to us that appellant would be entitled to a proper statement of the law on this point, if a proper request should be made.

Appellant also contends that evidence of an involuntary oral statement made by him to Detective R. B. Jones was improperly admitted. This detective had assisted in the investigation at the Siscoe house. There he learned that Mr. Siscoe had shot at someone inside the house and at some one fleeing from the house, and that someone other than the Siscoes had been shot. He also knew that there was blood inside the house and leading outside the house and that a .22-caliber pistol had been found at the rear of the house. Jones was advised at some time during the investigation or while en route to the hospital where the

Siscoes were being taken that an unidentified black man with a gunshot wound had been admitted to the hospital. He proceeded to the hospital. After checking on the Siscoes, Jones went into appellant's room for the required routine investigation conducted when a gunshot wound is reported. Jones was permitted to testify about a conversation with appellant, after the court had determined at an in camera hearing that it was admissible. Jones there testified that: the man in the room was appellant but that he gave his name as Bill Nelson; this person was not a suspect in the Siscoe shootings; appellant was conscious and talking and that, in investigating appellant's shooting, he asked appellant what happened, without advising appellant of his constitutional rights; he wanted to check out this man's story to see whether he might be involved in the Siscoe shootings.

Jones then testified in open court that the appellant told him that he had received gunshot wounds while in a card game at the Ebony Pal Lounge at Wright and High Streets, and Jones said he sent officers to investigate and then went to interview Mr. Siscoe about the events of the evening, feeling that appellant was then a suspect. It was later shown that there had been no incident at the Ebony Pal Lounge of the type described to Jones by appellant and appellant's true identity was later established. The officer was properly investigating the report of the gunshot wound. Appellant was not sufficiently suspect at the time of the first conversation with the officer for the investigation to have reached the accusatory stage. We cannot accept appellant's argument that his physical and mental condition at the time Jones entered the room made the interrogation custodial. Appellant had not, at that time, been deprived of his freedom by the authorities in any significant way. The statements made tended to be exculpatory, but regardless of their nature, the inhibitions of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R. 3d 974 (1966), apply only to interrogation by law enforcement officers after the person questioned is in custody or has been deprived of his freedom of action in a significant way. Jones would have been derelict in his duty if he had not asked Johnson the questions he asked after he received the report of the gunshot wound.

We do not find any error in the admission of personal items obtained by Detective Jones in a search of Johnson's person in the hospital. During the last conversation with Siscoe, Jones obtained a description of the intruder Siscoe saw at his home. Jones said that he then returned to appellan's room. At this point in the trial another hearing was held in chambers. There Jones said that appellant was then definitely a suspect, and that when he entered the room he noted a bulge in appellant's pocket. Jones testified that he realized that appellant had been in a shooting, feared that appellant might be armed and had received information that the name given him was false, so he proceeded to stick his hands in Johnson's pocket to make sure he did not have a weapon. Jones said that he was unable to "frisk" Johnson by patting his clothing because he was lying on a table and it would have been necessary to roll him over. He also said that whenever he felt an object in making a "frisk," he always checked to see what it was. He added that he was making sure that Johnson did not have a revolver in his pocket. The officer first removed and then replaced a cigarette lighter and "some change" he found in Johnson's pocket. A police guard was then placed at the door of Johnson's room. Johnson's clothing and personal property were delivered to Jones at the hospital. The change, consisting of $2.55 in pennies, nickels, dimes and quarters, was admitted into evidence along with other insignificant items. The original search of Johnson disclosed the money. That search was a reasonable one and not excessive in scope as a search for the protection of the officer and others from any unnecessary risk. See *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *Sibron v. New York,* 392 U.S. 40, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968). We are unable to say that the subsequent search and seizure of the property intruduced in evidence was not reasonable as an incident to Johnson's arrest. See *Chimel v. California,* 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969).

Officer Larry Dill of the Little Rock Police Department assisted in the investigation of the incident that took place at the Siscoe home. About 3:00 p.m. the next day he went to George Johnson's room at the hospital. In Chambers, he testified that he obtained permission to see Johnson

from the head nurse on the floor. He found Johnson awake and said he appeared to be alert. Dill stated that he identified himself, told Johnson why he had come and advised Johnson that he was a suspect in a murder and that he had the right to use a telephone, to remain silent, to talk to an attorney, either retained by him or appointed by the court, to stop interrogation at any time and that any statement he made would be used against him in a court of law. According to Dill, Johnson stated in his own words that he understood his rights but did not wish to sign a waiver form. Dill then asked Johnson about the shooting and Johnson said that it took place at Wright and High, the same location he had given Detective Jones the night before. Dill then told Johnson that there had been a similar shooting at 2218 Rock, the address of the Siscoe house. Johnson asked Dill what had happened and Dill told him that a little girl had been killed by someone who had apparently broken into the room. Dill said that Johnson stated that he did not shoot anybody. When the officer told Johnson that the police had lifted fingerprints, and that it would be necessary to take Johnson's prints, Johnson, according to Dill, said that they might find his prints but that he did not kill anyone, asked if they could not run ballistics tests to determine who had shot the little girl, and added that he (Johnson) might have been there, but he did not shoot anyone. Johnson then told the officer that he was tired but did want to talk to him later. Dill then left. According to Dill, the conversation lasted five or ten minutes. Upon this testimony, we cannot say that the circuit judge's findings that the statements of Johnson were voluntary were erroneous, even though we do not agree with the court's holding that the defendant bore the burden of showing that his statements were not voluntary.

Appellant also contends that the jury panel from which the jury was drawn did not represent a fair cross section of Pulaski County and that the court erred in failing to quash the jury panel. Specifically, he says that only one member was under 25 years of age, only seven under 30, a "token" number from farmers and the laboring class, and only six who had not had at least 12 years of

schooling. Little purpose would be served in our review of the evidence on the motion to quash the panel, which was denied by the circuit court, because a new panel will be used on retrial. We find no error, however, in the denial of the motion because we cannot say that the evidence presented showed a systematic or intentional exclusion of significant groups. It will never be possible to select a panel of jurors proportioned among every identifiable class or group in the same percentages that they bear to the total population of a county.

The judgment is reversed and the cause remanded for a new trial.

HOLT, J., not participating.