Harold Davy CASSELL *v.* STATE of Arkansas

CR 80-110                                            616 S.W. 2d 485

Supreme Court of Arkansas
Opinion delivered June 1, 1981

60

*E. Alvin Schay*, State Appellate Defender, by: *Ray Hartenstein*, Chief Deputy Defender, and *Gordon Cummings*, for appellant.

*Steve Clark*, Atty. Gen., by: *Victra L. Fewell*, Asst. Atty. Gen., for appellee.

Geoʀɢe Rose Smith, Justice. In the early morning hours of Sunday, December 21, 1975, a Springdale police officer, John Tillman Hussey, was murdered in a wooded area west of Fayetteville. The crime was particularly contemptible in that Hussey was shot four times in the back of the head with his own pistol while he was helpless, his wrists handcuffed behind him. Nearby a Travel-All van-type vehicle was set on fire and was still smoking when it was fortuitously discovered during the morning by a man who happened to be in the woods with his wife and children.

At about 3:49 that morning Officer Hussey had radioed to his headquarters that he was stopping a vehicle with license number JEX-966. A fellow officer, Brian Cobb, heard the radio communication and went at once to the place mentioned by Hussey, a point on the Fayetteville-Springdale highway. When Cobb arrived about four minutes after the radio message he found Hussey's police car parked by itself on the highway, its blue lights still flashing. Officer Hussey was not in the car and could not be found.

Prompt and thorough police work — federal, state and local — enabled the prosecuting attorney to file a capital murder charge on January 26, 1976, against James Ray Renton and the appellant, Harold Davy Cassell. The information charged the defendants with having murdered Officer Hussey while he was acting in the line of duty. Bench

warrants were issued, but some 30 months elapsed before Cassell was arrested in Montana in June, 1978, and returned to Arkansas in November of that year. The two cases were severed and tried separately. This appeal is from a verdict and judgment finding Cassell guilty and sentencing him to life imprisonment without parole.

Cassell's principal argument is that the State's proof, necessarily circumstantial for want of an eyewitness, was insufficient to support a verdict of guilty. Before narrating the testimony we again emphasize, as we have often done, that although the jury should be instructed, as it was here, that circumstantial evidence must be consistent with the guilt of the defendant and inconsistent with any other reasonable conclusion, AMCI 106, that is not the standard by which we review the evidence. Our responsibility is to determine whether the verdict is supported by substantial evidence, which means whether the jury could have reached its conclusion without having to resort to speculation or conjecture. *Brown* v. *State*, 258 Ark. 360, 524 S.W. 2d 616 (1975); *Abbott* v. *State*, 256 Ark. 558, 561-562, 508 S.W. 2d 733 (1974). The jury must be convinced of the accused's guilt beyond a reasonable doubt, but we, not having had the advantage of seeing and hearing the witnesses, are guided by the substantial evidence rule. *Graves & Parham* v. *State*, 236 Ark. 936, 370 S.W. 2d 806 (1963).

The trial continued for days, resulting in a 1,597-page typewritten record. The testimony is not really in much conflict. Neither Renton nor Cassell chose to testify in this case. We state the course of events not in the order in which the witnesses testified but in a chronological sequence.

A principal witness for the State was Connie Marie Caves, who was not quite eighteen when she began living with Renton in Hot Springs. The two were joined by Cassell in September, 1975, about three months before Hussey's murder. For at least ten months, from September, 1975, until July, 1976, Connie traveled about with Renton, Cassell, and a third man, Carl Don McLaughlin, who committed suicide several months after the Hussey murder.

The effect of Connie's testimony was that the three men were professional criminals committing burglaries. They used assumed names, Renton becoming Jimmie Lee Ford and Cassell becoming Richard Green. The four traveled through various states together, stopping at motels and using Renton's Travel-All van and Cassell's brown Chrysler passenger car. The men each selected and bought the tools they needed in their criminal activities, but all the tools were kept in a bag in the possession of Renton, who appears to have been the leader of the small group. Before doing a "job" the men would decide what tools would be needed.

Connie testified that on December 18 (Thursday) the three men we have mentioned and a fourth man, Larry Lynn Wallace, left her in a motel in Dallas and started to Arkansas to do a job there. On Saturday, December 20, they checked into a Holiday Inn at Fayetteville. Cassell signed the register as Richard Green. During the afternoon the Travel-All van and the Chrysler were seen parked together in the motel parking lot, with four men standing by talking together. An employee of the Campbell-Bell store in Rogers testified that during the day he saw two or three times in the store a man he later identified as Renton, accompanied by two others he could not describe. The men weren't doing business. "They were just there."

The Campbell-Bell store was burglarized that night; about 30 coats were taken. The criminals may have become alarmed and left hurriedly, for they left the bag of tools, which Connie identified positively, having seen it many times. Frank Perry, who lived near the store, testified that at about 1:45 a.m. he saw a van-type vehicle and a passenger car driving "real fast" across an open field between his house and Campbell-Bell. He thought, but not with certainty, that the car was a Chrysler vehicle. An expert witness testified that a photograph of the tire tracks showed that they resembled the design of the tires on Cassell's car, but no positive identification was possible.

Officer Hussey, as we have said, radioed at about 3:49 that he had stopped a van (unquestionably Renton's). Hussey's car, when found by Officer Cobb, was some 15 or 20

miles south of Rogers, headed toward Fayetteville. Darrell Harp, who drove a car in delivering newspapers in the area, testified that between 3:30 and 4:00 he saw three vehicles stopped together. A passenger car was in front, a Travel-All or surburban type vehicle about 20 or 30 feet behind it, and a Springdale patrol car behind that. It was dark, and Harp could see only the patrolman between his vehicle and the Travel-All. Harp had said in an earlier statement that the passenger car could have been a Ford, but he was uncertain about it.

A defense witness, Charles Gillman, a semi-retired person who had done some police work with the military police and with a railroad, testified that he drove by and saw three vehicles at about 3:45 a.m. He said the first one was an off-white Ford sedan, the next an International Travel-All, and the third a Springdale police car. He saw the police officer standing there. He could not see in the van, but there appeared to be several persons, possibly two or three, in it. The van had a Texas license plate. On cross examination he said he knew the officer was in a dangerous position. He was certain in his own mind the officer was in trouble, but he did not stop. He made no report of the incident until he happened to be stopped at a roadblock a week later. He said his first statements to the police were partly in error, in that he said the third vehicle was a Fayetteville police car, the van had an Arkansas license, and there were four persons in the van. The jury could have concluded from the testimony in the entire case that Gillman was also mistaken about the off-white Ford.

McLaughlin's sister testified that McLaughlin owned a white Ford in December, 1975, but there was no testimony that he had ever used such a car in his criminal activities. Connie testified she had never seen the vehicle. The sister testified that before her brother killed himself he telephoned her and said that he had killed a policeman in Arkansas and just couldn't forget about it. Connie testified on rebuttal that in June, 1976, she was in Seattle with Renton, Cassell, and McLaughlin. At that time, in the presence of the others, McLaughlin said that if he ever decided to take his own life he would leave a note or letter to let people know that he

would take the blame for the murder, so that his friends would not be implicated. Cassell was in on the discussion, and "he confirmed that if he was killed or anything like that he would want it blamed on him, also." That shared willingness to have all the blame cast upon the first one to die suggests joint guilt, as would be the case if all four men were present when Hussey was shot four times. Connie also testified that once in a motel in Alabama Cassell said that he knew there was a warrant for his arrest, that he was wanted for murder, and that if he was caught he would give up.

We mention two other matters that occurred on the Sunday morning of the murder. At about 11:00 o'clock Renton and Cassell appeared at the home of John Paul Potter, a used car dealer in Oklahoma City. Renton and Cassell had used their assumed names in buying the Chrysler from Potter·about 60 days earlier. Both men were nervous; Renton had shaved off his beard. They wanted to trade the Chrysler for another car. Potter's car lot was not open for business on Sunday, but he accompanied the two men to the lot and completed a deal by which the Chrysler was exchanged for another car.

Also on Sunday morning the discovery of the still smoking van was reported to the police. Hussey's body was found nearby, as was the license plate, JEX-966. In the ashes were snap buttons of the same kind as those on some of the coats stolen at Campbell-Bell.

Connie testified that the four men, Renton, Cassell, McLaughlin, and Wallace, returned to the motel in Dallas on December 23. By then Cassell had also shaved off his beard. All the men assumed new names and obtained new I.D.'s (identifications). The original group of four, Renton, Cassell, McLaughlin, and Connie apparently traveled together for another seven months, pursuing their course of crime over a territory ranging from Atlanta to Seattle. The change of identity served its purpose, for Cassell was not arrested until 30 months after Hussey's murder.

We have no hesitancy in holding the proof sufficient to support the verdict of guilty. Under our law one who

participates in a crime, standing by and aiding in its commission, is equally guilty with the principal who fires the fatal shot. In *Johnson* v. *State*, 252 Ark. 1113, 482 S.W. 2d 600 (1972), two men had entered a house to commit larceny. The owner of the house returned unexpectedly, and his daughter was killed in an exchange of gunfire. Regardless of who fired the fatal shot, even if it was the father, either intruder could be found guilty of murder. This language is pertinent to the case at bar:

> Each conspirator or participant is responsible for everything done which followed directly and immediately in the execution of the common purpose as one of its probable and natural consequences. *Bosnick* v. *State*, 248 Ark. 846, 454 S.W. 2d 311. The burglary and larceny, if committed, or the scheme to commit these crimes, if it existed, did not terminate until the perpetrators had left the scene. *Clark* v. *State*, 169 Ark. 717, 276 S.W. 849. The acts of the participants in an effort to escape are a part of the continuous scheme or conspiracy and the act of one is the act of all. *Wilson* v. *State*, [188 Ark. 846, 68 S.W. 2d 100]; *Clark* v. *State*, supra; *Maxwell* v. *State*, 188 Ark. 111, 64 S.W. 2d 79. In the cases cited in *Wilson* from other jurisdictions, it is clearly recognized that the law holds a participant in a crime responsible for the acts of another acting in concert with him or in the furtherance of a common object, design or purpose. *Commonwealth* v. *Campbell*, 7 Allen 541, 89 Mass. 541 (1863); *Butler* v. *People*, 125 Ill. 641, 18 N.E. 338 (1888); *Taylor* v. *State*, 41 Tex. Cr. R. 564, 55 S.W. 961 (1900); *Keaton* v. *State*, 41 Tex. Cr. R. 621, 57 S.W. 1125 (1900); *Commonwealth* v. *Moore*, 121 Ky. 97, 88 S.W. 1085 (1905).

This case is wholly different from those in which the only evidence to connect the accused with a crime is his association with a participant at a time and place remote from the offense. E.g., *Vaughn and Wilkins* v. *State*, 252 Ark. 505, 479 S.W. 2d 873 (1972), distinguished in *Redman* v. *State*, 265 Ark. 774, 784, 580 S.W. 2d 945 (1979). Here the proof of joint participation and therefore common guilt is in our opinion convincing.

In our discussion we may disregard Wallace, about whom the record tells us little. The other three, Renton, Cassell, and McLaughlin, had traveled together as professional criminals for three months before the Hussey murder and continued to travel together for seven months after that murder. They used the Travel-All van and the Chrysler car when needed. All four men came from Dallas to Fayetteville in the two vehicles for the avowed purpose of committing crime. They stayed together at the motel. At least three of them, Renton and two others, familiarized themselves with the layout of the Campbell-Bell store at Rogers. All four, or at the least two or three were in the van when Hussey stopped it; so the fourth man was presumably in the lead car. The two vehicles must have been traveling together, for they both stopped after Hussey flashed his lights. At least two of the four were present at Hussey's execution, because a second vehicle had to be used to drive the 14 miles from the burned van back to the Holiday Inn.

It is hardly possible to suppose that these experienced criminals did not suspect that Hussey had radioed a description of the van and perhaps of the other vehicle. They apparently acted upon that probability by murdering Hussey, by burning the Travel-All in a wooded area where its almost immediate discovery came about by chance, and by going out of their way to take the Chrysler to Oklahoma to the one dealer who knew the car and might be likely to trade for it on a Sunday morning. Renton and Cassell must have acted in haste to reach Oklahoma City as quickly as they did, for it must have taken some time to find a secluded spot in unfamiliar territory, to murder Hussey, to build a fire that effectively burned the van, to return to the motel, pack up and leave, and to drive some 200 miles to Oklahoma City. That both men were anxious to dispose of the Chrysler as soon as possible implies that the lead car stopped on the highway was the Chrysler, not an off-white Ford as stated by Gillman.

We have held that relevant circumstances include the presence of an accused in proximity to the crime, opportunity, association with persons involved in a manner suggesting joint participation, and possession of instruments used

in the commission of the offense. *Jackson* v. *State*, 256 Ark. 406, 409, 507 S.W. 2d 705 (1974). Flight from the scene of the crime has long been regarded as a circumstance corroborative of other proof of guilt. *Stevens* v. *State*, 143 Ark. 618, 221 S.W. 186 (1920). Every one of those relevant circumstances is shown here, plus the fact that the Campbell-Bell burglary was planned in advance and the probability that the abduction and murder of Officer Hussey were prompted by the thieves' possession of stolen goods in the van.

To sum up, our substantial evidence rule in a case depending on circumstantial evidence means simply that the proof must go beyond presenting the jury a choice so evenly balanced that a finding of guilt must rest not on testimony but on conjecture. That is not the situation in this case. To the contrary, defense counsel have not in the course of an excellent brief ventured to formulate any theory of the crime by which Cassell might emerge as an innocent man, wrongly accused of a murder in which he had no part. Nor have we been able to reconcile such a theory with the evidence. The jury apparently found criminal complicity on Cassell's part, because one of the mitigating circumstances unanimously specified by the jury was that the capital murder was committed by another person and that Cassell was an accomplice. The evidence supporting the verdict of guilty amply satisfies the requirement that it be substantial.

The other five points for reversal are without comparable difficulty and require little discussion. First, it is argued that the court should have had the court reporter reread certain testimony when the jury interrupted its deliberations to send a note to the judge asking for a transcript of the testimony of Frank Perry, Darrell Harp, Charles Gillman, and Larry Johnson, the last-named being a defense witness who testified that on December 20 he saw in Springdale a blue van, having Texas license tags, occupied by three men, and being driven by a man the witness identified from photographs as McLaughlin. The court denied the request for a transcript, explaining to the jury that it would take a long time to get a transcript and mentioning other obstacles.

It is insisted that the court was required by statute to

grant the jury's request, in view of Ark. Stat. Ann. § 43-2139 (Repl. 1977). We cannot consider this point, for want of an objection below. *Wicks* v. *State*, 270 Ark. 781, 606 S.W. 2d 366 (1980). The court reporter took down the judge's remarks denying the request, but there is no record of any objection by defense counsel. The only reference to a possible objection was in the prosecutor's oral argument when a motion for a new trial was being presented. The prosecutor then said there was a discussion at the trial bar when the note came in; so counsel evidently were present. The prosecutor also said, later: "I'm not sure if they objected or not. I think there was . . . some sort of an objection, but . . . I can't recall exactly what transpired." For all the record shows, the objection may have been to the possible granting of the jury's request, not to its denial. That attitude might well have been taken by defense counsel, since two of the witnesses named by the jury had testified for the prosecution. In any event, without an objection there is no basis for appellate review.

Second, defense counsel argues that a "death qualified" jury is more prone to convict. There was no proof to support that contention when it was made by motion in the trial court. We adhere to our previous ruling that the argument is without merit. *Miller* v. *State*, 269 Ark. 341, 605 S.W. 2d 430 (1980).

Third, Cassell was not denied a speedy trial. He was arrested on November 10, 1978. The next four terms of court began on January 1, April 1, July 1, and October 1. When the case was set to be tried on September 10, which would have been within the third term and therefore permissible, Criminal Procedure Rules 28.1 and 30.1 (b), Cassell moved for a dismissal. The trial court found that there had been periods of excusable delay, but even if there had not been Cassell would have been entitled under Rule 30.1 (b) only to a release on his own recognizance, not to an absolute discharge. *Matthews* v. *State*, 268 Ark. 484, 489, 598 S.W. 2d 58 (1980).

Alternatively, Cassell argues in this court that our former statute requiring an incarcerated defendant to be

tried within two terms of court laid down a rule of substantive law which this court could not supersede by a rule of procedure permitting a longer delay. Ark. Stat. Ann. § 43-1708 (Repl. 1977). That statute, however, was not substantive law merely because its violation might have a substantive effect. That is true of many procedural statutes, such as a statute of limitations or a statute requiring a defendant to file an answer within 20 days after the service of summons. In criminal matters substantive law declares what acts are crimes and prescribes the punishment; procedural law provides or regulates the steps by which one who violates a criminal statute is punished. *Roberts* v. *Love*, 231 Ark. 886, 333 S.W. 2d 897 (1960). Under that distinction a speedy trial statute is procedural.

Fourth, proof of the Campbell-Bell burglary was clearly admissible as being relevant to prove both the motive and the identity of the murderers. Uniform Evidence Rule 404 (b). We have already shown that the circumstantial evidence was amply sufficient to connect Cassell with the burglary.

Fifth, when disc number 1030 was drawn from the jury wheel, the clerk erroneously copied the name of juror 1031 from the master list; so the wrong juror was summoned. Also, the names were written on a yellow legal pad before being transferred to the jury book. Both errors were trivial and did not amount to such substantial irregularities as to be a basis for a challenge to the entire jury. Ark. Stat. Ann. § 39-215 (Supp. 1979);*Huckaby* v.*State*, 262 Ark. 413, 557 S.W. 2d 875 (1977). Moreover, as in *Huckaby*, there is not the slightest question about the integrity of the list.

No error is shown by the abstract of other objections.

Affirmed.

HICKMAN and PURTLE, JJ., dissent.

DARRELL HICKMAN, Justice, dissenting. The State proved that a terrible crime had been committed. It proved that the appellant is no doubt a professional thief. The State did not prove by any acceptable legal standard that this appellant is

guilty of killing the policeman or that he in any way aided in that crime.

I am convinced that in this case the majority is abandoning its standard of review for criminal cases. We should abide by the rule that there must be substantial evidence to support a finding of guilty. We recently defined this standard as:

> ... *evidence that is of sufficient force and character that it will, with reasonable and material certainty and precision, compel a conclusion one way or the other. It must force or induce the mind to pass beyond a suspicion or conjecture.* Ford on Evidence, Vol. 4 § 549, page 2760. Substantial evidence has also been defined as 'evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the *test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences.*' [Emphasis added.]

*Jones* v. *State*, 269 Ark. 119, 598 S.W. 2d 748 (1980).

In *Jones*, we referred to the United States Supreme Court's requirement of proof in criminal cases because our law must meet the United States Supreme Court's standard. The United States Supreme Court in *Jackson* v. *Virginia*, 443 U.S. 307 (1979) defined the constitutional standard for sufficiency of proof as whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

What "substantial" evidence is there that Cassell murdered the policeman? What substantial evidence is there that Cassell solicited, aided, or encouraged in any way the officer's death? Those are the only questions before us. It was not proved that Cassell had been in Rogers, Arkansas, earlier that day when Renton visited the Campbell-Bell store. It was not even proved that he was in Rogers, Arkansas, when a burglary occurred. It was not proved with any certainty that

his car, a Chrysler, was there. It was certainly not proved that he was in the Travel-All registered to Renton which was stopped by Officer Hussey. This Travel-All was stopped two hours after the burglary and twenty miles away. It was not even proved that Cassell's vehicle was at the scene where the officer stopped a vehicle. There is no proof at all to connect Cassell to the apparent scene of the murder which occurred several miles from where the Travel-All was stopped.

There was evidence that a passenger car, a '65, '66 or '67 model, with a "van or whatever" left the vicinity of the Campbell-Bell store about 1:45 A.M. At the trial a witness said he thought it was a Chrysler vehicle. He based this on the fact he had previously owned a '65 Plymouth. There was evidence that a '65 Plymouth is in no way similar to Cassell's car, a '71 Chrysler. There was evidence that a white Ford passenger vehicle with a Texas license was stopped in front of the Travel-All on the highway. There was evidence that McLaughlin owned a white Ford with Texas tags. There was no proof at all that Cassell or his vehicle were present when the officer stopped the Travel-All. One witness said "two or three" people were in the Travel-All. Another saw no one except the officer.

On this evidence the majority concludes that what happened was as follows:

At least three of them, Renton and two others, familiarized themselves with the layout of the Campbell-Bell store at Rogers. All four, or at the least two of them, committed that burglary, two vehicles being used. Gillman's testimony for the defense indicates that two or three were in the van when Hussey stopped it; so the fourth man was presumably in the lead car. The two vehicles must have been traveling together, for they both stopped after Hussey flashed his lights. At least two of the four were present at Hussey's execution, because a second vehicle had to be used to drive the 14 miles from the burned van back to the Holiday Inn.

It is hardly possible to suppose that these experienced criminals did not suspect that Hussey had

radioed a description of the van and perhaps of the other vehicle. They apparently acted upon that probability by murdering Hussey, by burning the Travel-All in a wooded area where its almost immediate discovery came about by chance, and by going out of their way to take the Chrysler to Oklahoma to the one dealer who knew the car and might be likely to trade for it on a Sunday morning.

Who were the two others with Renton in Rogers? We don't know, but Cassell was not identified as one of them. Did all four or only two of them commit the burglary? We don't know whether it was one or four. Were two vehicles used or more? Two vehicles were seen leaving the area together. What happened in the two hours between the time the vehicles were seen in Rogers and the Travel-All was stopped? We don't know. Where is the evidence that there was a "lead" car? There is none. Where is the evidence that the two vehicles were traveling together on the highway? There is none. Who were the "two" present when Hussey was killed several miles from where the vehicle was stopped? There is no evidence that anyone was present except that obviously the officer was killed by someone and that he was found near a vehicle registered to Renton. Where is the evidence that "two" were present? Where is the evidence that a second vehicle had to be used to drive back to the Holiday Inn? There is none. That is all speculation. Where is the evidence that these criminals suspected Hussey had radioed a description of the van and "perhaps the other vehicle"? There is none. Where is the evidence that acting on that "probability" Hussey was murdered? There is none. That is all speculation.

The only hint at all that Cassell may have been present at the *burglary* was the weak testimony of the one witness who looked out of his window at 1:45 A.M. and saw two vehicles.

No doubt Cassell was in Fayetteville the day before; no doubt he was with Renton in Tulsa, Oklahoma, the next day. The evidence indicates that Renton and Cassell had been partners in burglary and thievery. But when the

evidence is examined, as we are required to do, one can only conclude that it would be speculation to say that Cassell killed the officer or aided in any way in the murder. The State cannot place Cassell or his vehicle at the abduction scene or murder scene. It cannot even conclude that four people were present. The State's proof simply is short of that proof required by our standard and by the United States Supreme Court's standard.

Ours is a system that presumes innocence, not guilt; it requires the State to prove guilt by competent evidence beyond a reasonable doubt; it requires nothing of a defendant. It is a system that requires us to affirm convictions on the basis of substantial evidence, not speculation.

The State no doubt made its best effort to show guilt. Car tracks which could have been made by a thousand different cars were found outside the Rogers store. The car could have been Cassell's or anyone else's. But where is the proof that Cassell was there? He may have been on the highway, but where is the proof that he was there? There is no evidence Cassell participated in this murder. It is understandable why a jury in a case like this could not bring itself to apply the law. Under such circumstances it is hard for laymen to actually believe in the presumption of innocence and that the State must prove guilt beyond a reasonable doubt. It was a terrible crime and the jury had before it a criminal. It is only human to want to lay responsibility for such a crime on one who might have done it. But judges cannot so easily avoid this duty. In such cases we must adhere to our rules regardless of the nature of the crime or the character of the defendant. Otherwise, the right to a fair trial cannot exist; the law will have no integrity.

The majority distinguishes the case of *Vaughn* v. *State*, 252 Ark. 505, 479 S.W. 2d 873 (1972) as it well should. Applying the logic of that case, Cassell must be acquitted.

The question before us is not the character of Cassell. It is not the fact that a terrible crime was committed for which someone or several people should pay. We must apply the law; we must apply the test from *Jones* v. *State, supra.* Does

the evidence compel a conclusion that Cassell participated in the murder? Does it force the mind to pass beyond a suspicion or conjecture? The majority has created its own script of what happened. I cannot find substantial evidence to support such speculation. I respectfully dissent.

PURTLE, J., joins in this dissent.